**ELLIS BANKING CORPORATION,**
**Petitioner-Appellant,**

v.

**COMMISSIONER OF INTERNAL**
**REVENUE SERVICE,**
**Respondent-Appellee.**

No. 81–5895.

United States Court of Appeals,
Eleventh Circuit.

Oct. 15, 1982.

Rehearing and Rehearing En Banc
Denied Jan. 31, 1983.

Carlton, Fields, Ward, Emmanuel, Smith & Cutler, P.A., Michel G. Emmanuel, Nathaniel L. Doliner, Tampa, Fla., for petitioner-appellant.

John F. Murray, Act. Asst. Atty. Gen., Michael L. Paup, Glenn L. Archer, Jr., Gary R. Allen, Kristina E. Harrigan, Tax Div., Appellate Section, Dept. of Justice, Washington, D.C., for respondent-appellee.

Before WISDOM,* RONEY and HATCHETT, Circuit Judges.

WISDOM, Circuit Judge:

This case presents the question: are expenditures made in the investigation of the financial condition of a corporation, in preparation for a proposed acquisition of its stock, deductible as ordinary and necessary business expenses under section 162 of the Internal Revenue Code[1] or expenditures that must be capitalized under section 263? Predictably, the taxpayer contends that the expenditures are currently deductible; the Commissioner insists on capitalization. We agree, for the most part, with the Commissioner.

I.

The taxpayer, Ellis Banking Corporation, is a bank holding company doing business in Florida. During 1974, the tax year at issue, Florida law did not permit branch banking, so, to expand into new geographic markets, Ellis had no choice but to acquire the stock of other banks or to organize new banks.

On August 21, 1973, Ellis executed an agreement with Parkway National Bank of Tallahassee and certain Parkway shareholders to acquire all the stock of Parkway in exchange for Ellis stock. The agreement was subject to a number of conditions, including the following:

(1) the Federal Reserve Board would approve the acquisition,

(2) the Securities and Exchange Commission would register the Ellis stock to be exchanged,

(3) for accounting purposes, Ellis would be able to treat the acquisition as a "pooling of interests", and

(4) Parkway's financial condition would not be materially different from that set forth in financial statements supplied to Ellis.

Upon execution of the agreement, but not before, Ellis was entitled to inspect Parkway's books and records to evaluate Parkway's financial condition, to obtain the information necessary for the various applications to governmental agencies, and to verify that the exchange ratio specified in the agreement was an accurate reflection of the relative values of the Ellis and Parkway stocks. The stock exchange was finally consummated on July 12, 1975, after a downward adjustment of the exchange ratio to reflect the results of Ellis's examina-

---

* Honorable John Minor Wisdom, U.S. Circuit Judge for the Fifth Circuit, sitting by designation.

1. All statutory references are to the Internal Revenue Code of 1954, as amended and in effect in 1974.

tion of Parkway's records. Ellis capitalized the purchase price of the stock.[2]

In 1974, in connection with the examination of Parkway's books, Ellis made the following expenditures:

| | |
|---|---|
| Office supplies | $41.86 |
| Filing fees | 100.00 |
| Travel expenses | 3,041.58 |
| Accounting expenses | 5,894.00 |
| Total | $9,077.44 |

The accounting expenses included two separate amounts charged by Peat, Marwick, Mitchell & Co., Ellis's independent certified public accountant. First, Ellis paid $3,400 to Peat Marwick in connection with the registration of the Ellis stock with the SEC. The registration required Ellis to submit certain data that Peat Marwick had previously certified, but, before Peat Marwick would consent to the use of its name in connection with the certification, it determined whether any material change had occurred. Second, Ellis paid $2,494 to Peat Marwick. In a letter to Ellis, Peat Marwick explained that part of the accountants' time was spent observing Ellis's auditors, in anticipation of including Parkway in Ellis's consolidated statements and of certifying those statements. Also, Peat Marwick explained that much of the time was devoted to researching whether treatment as a "pooling of interests" was available.

2. That "price", of course, was paid in Ellis stock rather than in money, and any reference to "price" in this opinion refers to the stock exchanged.

3. The relevant part of section 162 reads:
   (a) In general.—There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including—
   (1) a reasonable allowance for salaries or other compensation for personal services actually rendered;
   (2) traveling expenses . . .;
   (3) rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business . . . .

4. Although the Supreme Court set out five separate requirements, the third requirement is

Ellis deducted the $9,077.44 as an ordinary and necessary business expense under section 162. The Commissioner disallowed the deduction, and the Tax Court upheld his determination. *Ellis Banking Corporation v. Commissioner,* 1981, 41 T.C.M. 1107. The taxpayer appeals.

## II.

To be deductible under section 162,[3] an expenditure must meet five conditions, set out in *Commissioner v. Lincoln Savings and Loan Association,* 1971, 403 U.S. 345, 91 S.Ct. 1893, 29 L.Ed.2d 519. First, it must be paid or incurred during the taxable year. Second, it must be made to carry on a trade or business. Third, it must be an expense. Fourth, it must be a necessary expense. Finally, it must be an ordinary expense.[4]

The expenditures at issue here unquestionably meet most of the requirements. Ellis made the payments during the taxable year for which it claims the deductions and in the course of its business of promoting banks. Also, the payments undoubtedly met the minimal standard embodied in the requirement that the expense be "necessary", for that term is construed to mean nothing more than "appropriate and helpful". *Commissioner v. Tellier,* 1966, 383 U.S. 687, 689, 86 S.Ct. 1118, 1119, 16 L.Ed.2d 185, 187–88. The sole issue, then, is wheth-

subsumed in the fifth. The word "ordinary" in the statute distinguishes deductible expenses from expenditures that must be capitalized and, if deductible at all, amortized over the life of the resulting asset. *See, e.g., Comm'r v. Tellier,* 1966, 383 U.S. 687, 688–90, 86 S.Ct. 1118, 16 L.Ed.2d 185, 187–88. The term "expense" as a term of art in accounting refers only to items that meet the requirement of ordinariness. The Court implicitly recognized that the fifth requirement includes the third when it phrased the question in *Lincoln Savings and Loan* as whether the payment was an expense and an ordinary one. 403 U.S. at 354, 91 S.Ct. at 1899, 29 L.Ed.2d 527. For an exhaustive discussion of the meaning of "expense" and "capital expenditure", *see NCNB Corp. v. United States,* 4 Cir. 1981, 684 F.2d 285 (en banc).

er the expenditures were current, ordinary expenses or capital expenditures.

■ While current expenses are deductible under section 162, section 263 denies a deduction for any amounts paid out for assets with lives in excess of one year. § 263(a).[5] The requirement that costs be capitalized extends beyond the price payable to the seller to include any costs incurred by the buyer in connection with the purchase, such as appraisals of the property or the costs of meeting any conditions of the sale. *See, e.g., Woodward v. Commissioner,* 1970, 397 U.S. 572, 90 S.Ct. 1302, 25 L.Ed.2d 577; *United States v. Hilton Hotels Corp.,* 1970, 397 U.S. 580, 90 S.Ct. 1307, 25 L.Ed.2d 585. Further, the Code provides that the requirement of capitalization takes precedence over the allowance of deductions. §§ 161, 261; *see generally Commissioner v. Idaho Power Co.,* 1974, 418 U.S. 1, 94 S.Ct. 2757, 41 L.Ed.2d 535. Thus an expenditure that would ordinarily be a deductible expense must nonetheless be capi-

talized if it is incurred in connection with the acquisition of a capital asset.[6] The function of these rules is to achieve an accurate measure of net income for the year by matching outlays with the revenues attributable to them and recognizing both during the same taxable year. When an outlay is connected to the acquisition of an asset with an extended life, it would understate current net income to deduct the outlay immediately. To the purchaser, such outlays are part of the cost of acquisition of the asset, and the asset will contribute to revenues over an extended period. Consequently, the outlays are properly matched with revenues that are recognized later and, to obtain an accurate measure of net income, the taxpayer should deduct the outlays over the period when the revenues are produced.

■ These principles, we conclude, require capitalization of most of the expenditures in this case.[7] Ellis expected to realize benefits over the course of its ownership of

---

**5.** The relevant part of section 263 reads:
(a) General rule.—No deduction shall be allowed for—
(1) Any amount paid out for new buildings or for permanent improvements or betterments made to increase the value of any property or estate. This paragraph shall not apply to—
(A) expenditures for the development of mines or deposits deductible under section 616,
(B) research and experimental expenditures deductible under section 174,
(C) soil and water conservation expenditures deductible under section 175,
(D) expenditures by farmers for fertilizer, etc., deductible under section 180,
(E) expenditures by farmers for clearing land deductible under section 182, or
(F) expenditures for removal of architectural and transportation barriers to the handicapped and elderly which the taxpayer elects to deduct under section 190.
(2) Any amount expended in restoring property or in making good the exhaustion thereof for which an allowance is or has been made.
The courts have uniformly interpreted this provision as denying a deduction for the cost of any long-lived asset; its list is not exhaustive. *See, e.g., Comm'r v. Lincoln Sav. and Loan Ass'n,* 1971, 403 U.S. 345, 358, 91 S.Ct. 1893, 1901, 29 L.Ed.2d 519, 529.

**6.** We do not use the term "capital asset" in the restricted sense of section 1221. Instead, we use the term in the accounting sense, to refer to any asset with a useful life extending beyond one year.

**7.** We do not mean to overstate the simplicity of these rules. In the case before us, they are of relatively easy application. The proper line between deduction and capitalization, however, becomes much more difficult to draw when the long-lived benefit achieved as the result of an expenditure is not a tangible asset or a readily identifiable intangible asset. *See Iowa-Des Moines Nat'l Bank v. Comm'r,* 1977, 68 T.C. 872, *aff'd,* 8 Cir. 1979, 592 F.2d 433. That problem has received a great deal of judicial attention, with results that are not entirely consistent. *See, e.g., Comm'r v. Lincoln Sav. and Loan Ass'n.,* 1971, 403 U.S. 345, 91 S.Ct. 1893, 29 L.Ed.2d 519; *Welch v. Helvering,* 1933, 290 U.S. 111, 54 S.Ct. 8, 78 L.Ed.2d 212; *NCNB Corp. v. United States,* 4 Cir. 1981, 651 F.2d 942, *vacated pending rehearing en banc* (No. 78–1771); *First Nat'l Bank v. United States,* 4 Cir. 1977, 558 F.2d 721 (per curiam); *Briarcliff Candy Corp. v. Comm'r,* 2 Cir. 1973, 475 F.2d 775; *United States v. Akin,* 10 Cir. 1957, 248 F.2d 742, *cert. denied,* 1958, 355 U.S. 956, 78 S.Ct. 542, 2 L.Ed.2d 532; *Southland Royalty Co. v. United States,* Ct.Cl. 1978, 582 F.2d 604, *cert. denied,* 1979, 441 U.S. 905, 99 S.Ct. 1991,

the Parkway stock, and the investigation expenditures, which were directly related to an examination of this specific property, were part of the cost to Ellis of owning the stock. Those expenditures should be deducted only when the related benefits are realized. *See, e.g., Union Mutual Life Insurance Co. v. United States,* 1 Cir. 1978, 570 F.2d 382, *cert. denied,* 439 U.S. 821, 99 S.Ct. 87, 58 L.Ed.2d 113;[8] *Cagle v. Commissioner,* 5 Cir. 1976, 539 F.2d 409; *Beneficial Industrial Loan Corp. v. Handy,* D. Del.

1936, 16 F.Supp. 110, *aff'd,* 3 Cir. 1937, 92 F.2d 74 (per curiam); Rev. Rul. 77–254, 1977–2 Cum. Bull. 63; Rev. Rul. 74–104, 1974–1 Cum. Bull. 70; Rev. Rul. 71–191, 1971–1 Cum. Bull. 77, *clarified,* Rev. Rul. 79–346, 1979–2 Cum. Bull. 84.[9]

One of the major functions of the examination of Parkway's books was to determine the appropriateness of the exchange ratio, or the acquisition price. In *Woodward* and *Hilton,* the Supreme Court held that the taxpayers had to capitalize the

---

60 L.Ed.2d 373. This case, fortunately, does not present such intractable problems, for the taxpayer unquestionably made the expenditures in an attempt to acquire an identifiable asset—the stock of Parkway—to which the costs should be attributed.

One of these difficult cases deserves closer attention. *NCNB Corp. v. United States,* 4 Cir. 1981, 651 F.2d 942, *vacated pending rehearing en banc* (No. 78–1771), involved a taxpayer bank that expanded into new markets by branching. A divided panel of the Fourth Circuit required the taxpayer to capitalize the costs of preparing studies of the banking markets in various cities. This case is a stronger case for requiring capitalization, for two reasons. First, some of the studies in *NCNB* were not studies primarily of a single branch location but of an entire market. They were therefore more closely related to general management planning than was the investigation here. Other studies at issue in *NCNB,* though, were studies of a specific location, indistinguishable from studies of a specific potential subsidiary. Second, the taxpayer here acquired what is unquestionably an asset—the stock of Parkway—while the taxpayer in *NCNB* acquired only whatever long-term utility the studies had, far less clearly an identifiable asset. If the view of the panel in *NCNB* does not prevail on rehearing, this latter distinction may present an anomaly: a bank that expands into new markets by branching can deduct investigation costs while a bank that expands into new markets by acquiring the stock of other banks must capitalize those investigation costs. But we think that the anomaly militates in favor of recognizing that investigation by a branching bank of specific potential branch locations creates an asset, the cost of which should be capitalized, rather than adopting the fiction that the investigation of a potential subsidiary by a bank holding company is not connected to the acquisition of shares of stock that are undeniably an asset with an extended useful life.

**8.** The taxpayer in *Union Mutual* was a life insurance company, subject to the provisions of subchapter L, §§ 801–820. The question

was whether a deduction was allowable under section 804(c)(1). The difference is insignificant, though, for the court required that the taxpayer qualify under section 162 in order to take a deduction under section 804(c)(1). 570 F.2d at 390.

Ellis attempts to distinguish *Union Mutual* because the expenditures there were made in the course of investigating real estate investments, and the taxpayer, according to Ellis, was a life insurance company and therefore not in the business of investing in real estate. Ellis misreads *Union Mutual.* Although the taxpayer's primary business was life insurance, it regularly invested substantial sums in real estate, and the court referred to its "real estate business". *Id.* at 389.

**9.** Ellis takes issue with this application of the general principles stated earlier, arguing that *York v. Commissioner,* 4 Cir. 1958, 261 F.2d 421, permits deduction of the costs of investigating an investment if the taxpayer is in the business of making such investments, even if the investigation is connected with the acquisition of a capital asset. In *York,* the taxpayer was in the business of developing commercial and residential real estate. He commissioned a study of the industrial potential of a tract of land and sought to deduct the cost. The Fourth Circuit, reversing the Tax Court, allowed the deduction, after concluding that development of industrial real estate is the same business as development of commercial and residential real estate. It never considered the possibility that the expenditure might be capital in nature, focusing solely on the requirement of section 162 that the taxpayer be in the trade or business. We will not follow an implicit holding on a question never considered by the court, for the great weight of authority, which we have cited in text, and our examination of the relationship of sections 162 and 263 establish that the cost of investigating an investment is part of the cost of the investment, even if the taxpayer is not entering a new business.

costs of appraisal proceedings as part of the cost of the stock acquired, saying, "When property is acquired by purchase, nothing is more clearly part of the process of acquisition than the establishment of a purchase price." *Woodward,* 397 U.S. at 579, 90 S.Ct. at 1307, 25 L.Ed.2d at 583; *see Hilton,* 397 U.S. at 584, 90 S.Ct. at 1309, 25 L.Ed.2d at 588. And in *Beneficial Industrial Loan Corp. v. Handy,* D. Del. 1936, 16 F.Supp. 110, *aff'd,* 3 Cir. 1937, 92 F.2d 74 (per curiam), the court held that it was "too clear for argument" that the costs of obtaining an accountants' evaluation of a target corporation were not deductible. 16 F.Supp. at 112. Those expenditures should therefore be capitalized.

Ellis relies on two main arguments in favor of deductibility. First, it makes a general argument about all the costs—that the expenditures were not made in connection with the *acquisition* but in connection with the *decision* to acquire the stock and with the evaluation of the Tallahassee market. Next, Ellis falls back on a specific

argument about the accounting fees—that the accounting firm was performing its general duty of supervising Ellis's auditors to provide Ellis with financial information and to prepare Ellis's income tax returns.[10] We think that neither argument supports the entire deduction, but the second argument compels us to remand to the Tax Court for a determination of the appropriateness of a partial deduction.

In connection with its first argument, Ellis notes that it was not committed to purchase the Parkway stock at the time it made the expenditures because the contract was subject to several conditions. In fact, the examination of Parkway's books revealed changes in its financial condition that would have excused Ellis's performance, and Ellis would not have completed the transaction without a downward adjustment of the exchange ratio. Furthermore, Ellis contends, the examination of Parkway's books provided general information about Parkway[11] that aided in management decision-making.

---

**10.** Ellis also devotes a portion of its brief to arguing that it is in the business of promoting banks, so that the expenditures made in that business are deductible. It is not enough to establish that expenditures are incurred in carrying on a trade or business to qualify for a deduction under section 162—*all* of the requirements set out above must be fulfilled. Indeed, if being in the business sufficed, Ellis would be able to deduct the purchase price of the Parkway stock.

It is for this reason that much of the authority relied upon by the taxpayer is inapposite. For instance, Ellis relies heavily on *Price v. Comm'r,* 1971, 30 T.C.M. 1405–3. The taxpayer in that case was an individual employed by a corporation. He expended sums in conducting activities preliminary to organizing a bank, expecting to receive an ownership interest in the bank. The project was abandoned, and the taxpayer attempted to deduct his expenditures. The Tax Court denied a section 162 deduction, stating that the taxpayer was not in the trade or business of promoting banks. Ellis insists that this case stands for the proposition that a taxpayer who is in the business of promoting banks may deduct initial investigatory expenditures under section 162. Of course the case does not establish such a role—a holding that the taxpayer has failed to meet one of five conjunctive requirements does not in any way

suggest that he has met the others. Indeed, in *Price,* the Tax Court went on to hold that a deduction for an ordinary and necessary expense for the production of income under section 212 was inappropriate, for, "until the charter was granted, there could be no production of income. Until that time, the expenses were merely capital expenditures." *Id.* at 1410. The court then permitted the deduction of a loss under section 165(c)(2), stating, "Since the expenses could have been capitalized if the project had been successful, we see no reason not to allow the deduction of these expenditures as a loss when the project is abandoned." *Id.* Obviously, the court viewed a deduction for a current expense under section 162 as improper, even if the taxpayer had been in the trade or business of promoting banks.

**11.** Ellis also contends that the examination of Parkway's books provided general information about the Tallahassee market. The Tax Court made no such finding, viewing the examination as connected with the Parkway acquisition. That view of the facts is not clearly erroneous. Even if the examination had produced information about the Tallahassee market that, as Ellis contends, would continue to be useful in its business of holding banks, that future benefit of the study might require capitalization and amortization over the period during which the

■ We agree with Ellis that the expenditures were made in the investigation of Parkway and without a firm commitment to buy. Nevertheless, they are not deductible. As we have discussed, the expenses of investigating a capital investment are properly allocable to that investment and must therefore be capitalized. That the decision to make the investment is not final at the time of the expenditure does not change the character of the investment; when a taxpayer abandons a project or fails to make an attempted investment, the preliminary expenditures that have been capitalized are then deductible as a loss under section 165. *See, e.g., Radio Station WBIR, Inc. v. Commissioner,* 1959, 31 T.C. 803, 814, 815–16; *Champlain Coach Lines v. Commissioner,* 2 Cir. 1943, 138 F.2d 904; Rev. Rul. 77–254, 1977–2 Cum. Bull. 63; Rev. Rul. 74–104, 1974–1 Cum. Bull. 70; Rev. Rul. 71–191, 1971–1 Cum. Bull. 77, *clarified,* Rev. Rul. 79–346, 1979–2 Cum. Bull. 84. As the First Circuit stated, "... expenditures made with the *contemplation* that they will result in the creation of a capital asset cannot be deducted as ordinary and necessary business expenses even though that expectation is subsequently frustrated or defeated." *Union Mutual,* 570 F.2d at 392 (emphasis in original). Nor can the expenditures be deducted because the expectations might have been, but were not, frustrated.

■ Next, Ellis contends that the charges of Peat Marwick were attributable to its performance of its general duties. The $3,400 payment to Peat Marwick covered the re-examination of material to be certified in the registration filed with the SEC. Ellis contends that this service provided it with valuable financial information about itself and that it should therefore be deductible just as expenses incurred for general financial accounting for management are. It relies on *Southern Engineering and Metal Products Corp. v. Commissioner,* 1950, 9 T.C.M. 93. In that case, a

corporation undertook an appraisal of its equipment to establish an inventory. When one of the two shareholders later bought out the other, the survey was used to value the shares. The Tax Court held that this incidental use of the survey in a capital transaction did not preclude an otherwise allowable deduction. Here, the accounting work was done to comply with a condition of the purchase agreement—registration of the Ellis stock with the SEC, and it was only incidental that Ellis gained any information about itself. When an expenditure is primarily in connection with the acquisition of a capital asset, and there is only an incidental and attenuated benefit that might otherwise lead to a deductible expense, *Southern Engineering* does not require us to permit a deduction.

The other component of the payment to Peat Marwick, $2,494, arose, according to Ellis, in connection with Peat Marwick's auditing duties. Although Peat Marwick explained that much of that amount was attributable to time spent researching whether treatment as a "pooling of interests" was available for accounting purposes—research necessary to determine whether a condition of the acquisition agreement was met—it also stated that part of the time was attributable to the observation of Ellis's auditors in connection with Peat Marwick's general auditing duties. The portion attributable to research is directly connected with the acquisition of Parkway and must be capitalized, but deduction of general auditing expense would be appropriate. The Tax Court declined to express any opinion on the question whether part of the $2,494 payment was actually properly attributable to general auditing, holding that, even if a portion was attributable to auditing, the taxpayer had offered no basis for allocation of the payment between expense and capital expenditure. The taxpayer ordinarily has the burden of proof in a challenge of the Commissioner's determination, *see* Tax Ct. R.

study was expected to have utility. *See NCNB Corp. v. United States,* 4 Cir. 1981, 651 F.2d

942, *vacated pending rehearing en banc* (No. 78–1771).

142(a); *Hartman v. Commissioner,* 1975, 65 T.C. 542. The Tax Court concluded therefore that Ellis's failure to establish the proper allocation precluded any deduction. We agree, of course, that the taxpayer generally has the burden of proof. But, under the "*Cohan* rule", if it is clear that the taxpayer is entitled to *some* deduction, but he cannot establish the full amount claimed, it is improper to deny the deduction in its entirety. Instead, the court should estimate to the best of its ability, retaining always the power to "bear[ ] heavily . . . upon the taxpayer whose inexactitude is of his own making". *Cohan v. Commissioner,* 2 Cir. 1930, 39 F.2d 540, 544 (L. Hand, J.).[12] *See generally* 4A J. Mertens, Law of Federal Income Taxation § 25.04 (Doheny rev. ed. 1979). It is therefore necessary to determine whether Ellis has established that part of the expenditure is attributable to Peat Marwick's general auditing duties. If it has, the Tax Court should estimate the amount allocable to general auditing and permit a deduction in that amount. If it has not, of course, Ellis must capitalize the entire amount as part of the cost of the Parkway stock, for the *Cohan* rule will apply only if Ellis can show its entitlement to *some* deduction. *See Bay Sound Transportation Co. v. United States,* 5 Cir. 1969, 410 F.2d 505, 511, *cert. denied,* 396 U.S. 928, 90 S.Ct. 263, 24 L.Ed.2d 226.

### III.

With the possible exception of part of the $2,494 payment to Peat Marwick, the expenditures that Ellis seeks to deduct are properly attributable to the acquisition of the Parkway stock. They are therefore capital in nature and not deductible under section 162. The case is AFFIRMED IN PART AND REMANDED IN PART.

12. The rule as announced in *Cohan* applied to travel and entertainment expenses. In that area, Congress has overruled the result in section 274(d), which imposes a heavy burden of substantiation on a taxpayer claiming deductions under section 162 for travel and entertainment expenses. But the *Cohan* principle was applied more generally and apparently survives where not legislatively overruled. *See, e.g., Cummings v. Comm'r,* 5 Cir. 1969, 410 F.2d 675, 679; *Green v. Comm'r,* 1980, 74 T.C. 1229, 1237; *see generally* 4A J. Mertens, Law of Federal Income Taxation § 25.04 (Doheny rev. ed. 1979). As Mertens explains,

. . . [A] taxpayer would [otherwise] in every case be denied a deduction for otherwise allowable expenses where there was a failure of strict proof on his part. Thus, even though it is quite apparent that because of the nature of the taxpayer's business certain types of ordinary and necessary expenses would have to be incurred and were actually paid, nevertheless, if the taxpayer did not maintain adequate records, no part of such expenses would be allowable because proof of detail or itemization was lacking. Fortunately, however, such automatic disallowance has not been the general rule . . . . *Id.*

The *Cohan* rule does not in any way shift the burden of proof. Stated another way, it simply provides that the failure of the taxpayer to establish the exact amount to which he is entitled should not lead the court to ignore that the taxpayer has met his burden of proof on his entitlement to *some* deduction.